UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
NICHOLAS NUNEZ, CHERYL PORTS-KELLEY, :
EVANGELINE PHILLIPS, TROY BOOTH, :
STEVEN DORSEY, RAMESES RODRIGUEZ, : **MEMORANDUM AND ORDER**
HERBERT REED and JOSE SANCHES, : 11-CV-3457 (DLI) (LB)
:
                Plaintiffs, :
:
     -against- :
:
ANDREW CUOMO, *Governor of the State of* :
*New York in both his official* :
*and individual capacity,* :
:
                Defendant. :
-------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On July 18, 2011, Plaintiffs[1] Nicholas Nunez, Cheryl Ports-Kelly, Evangeline Phillips, Troy Booth, Steven Dorsey, Rameses Rodriguez, Herbert Reed and Jose Sanches, all African-American, Asian-American or Latino correction officers employed by the Department of Corrections and Community Supervision ("DOCCS"), filed a complaint and motions for a temporary restraining order ("TRO")[2] pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and 42 U.S.C. §§ 1981, 1983 and 1985, against Defendant Andrew Cuomo in his individual and official capacity. In their motions, Plaintiffs

---

[1] All Plaintiffs filed this action *pro se*, and only obtained counsel immediately prior to the August 12, 2011 hearing. Specifically, counsel representing Mr. Nunez entered her appearance on the evening of August 11, 2011, and was granted leave by the court to represent the remaining Plaintiffs during the August 12, 2011 hearing.

[2] Plaintiffs originally filed the complaint and motion for a temporary restraining order as a class action but, pursuant to the court's July 21, 2011 order informing Plaintiffs that *pro se* plaintiffs cannot proceed as class representatives, each Plaintiff individually filed a separate motion on July 25, 2011. Although Plaintiffs have since retained counsel, they have neither amended their complaint nor renewed their class claim status. Based on their arguments at the hearing and subsequent submissions, each Plaintiff is apparently proceeding in an individual capacity.

request that the court prevent Defendant from shutting down Arthur Kill Correctional Facility ("Arthur Kill"), alleging his decision to close the facility was race-based in violation of Plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States Constitution. Defendant opposed the motions contending that Plaintiffs have failed to make a showing of irreparable harm and are unlikely to succeed on the merits. For the reasons set forth below, Plaintiffs' motions for a TRO are denied.

## BACKGROUND

On June 30, 2011, Defendant announced the closing of three medium security and four minimum security correctional facilities in New York, including Arthur Kill, which is a medium security facility located in Staten Island.[3] (*See* Fischer Decl. Ex. B.) The closures were ordered pursuant to Chapter 57, Part C of the Laws of 2011 enacted by the State Legislature, effective April 1, 2011, which authorized Defendant to close correctional facilities " . . . as he determines to be necessary for the cost-effective and efficient operation of the correctional system." (*See* Fischer Decl. at ¶ 6-7.)

Plaintiffs seek a TRO to prevent the closure of Arthur Kill because they claim that the closure will cause them irreparable harm, as it will force them to either transfer to a correctional facility outside of New York City or lose their jobs. Specifically, Plaintiffs argue that: (i) a transfer or loss of employment will cause major disruption to their daily lives and their families' lives; (ii) a transfer will result in an increase in costs due to relocation or a longer commute; and (iii) a transfer will result in the loss of location adjustment compensation ("location pay").

---

[3] The other facilities slated to be closed are: Mid-Orange Correctional Facility, Fulton Correctional Facility, Buffalo Work Release Facility, Camp Georgetown, Summit Shock Incarceration Correctional Facility, Oneida Correctional Facility and Arthur Kill. (*See* Declaration of Brian Fischer ("Fischer Decl.") Ex. B.) Notably, only two of the seven facilities are located within New York City.

2

Plaintiffs further allege that Defendant's decision to close Arthur Kill was based on discriminatory policies, procedures and practices utilized by Defendant to "avoid [the] loss of jobs to the larger white unionized workforce of ("DOC[C]S") employees in the Northern Up-State New York Counties while inflicting grossly disproportionate, and disparate socio-economic injury upon members of [Plaintiffs'] class." (Compl. at ¶ 13.) Plaintiffs argue that closing Arthur Kill, while maintaining other medium-security facilities in Northern New York Counties, where the predominately white prison labor force resides, "evidences . . . a racially disparate policy in its decision making in regards to ("DOC[C]S") employees in areas that have a significant number of Black, and Latino employees." (*Id.*) Plaintiffs also allege that "[D]efendant had been made aware of the discriminatory, and disparate treatment [Plaintiffs] would suffer" from the closure of Arthur Kill. (*Id.* at ¶ 10.)

In contrast, Defendant argues that Plaintiffs will not suffer irreparable harm, because they have the option to be transferred to another facility, which will be assigned according to Plaintiffs' stated preferences and the seniority of those officers who wish to be transferred. (*See* August 4, 2011 Declaration of Daniel F. Martuscello III ("Martuscello Decl. I") at ¶¶ 6-11.) In addition, DOCCS will provide a list of state housing available in the new locations and information regarding reimbursement for relocation. (*See id.* at ¶ 13; 8/12/11 Tr. at 38:5-39:8.) Defendant further counters that any discrepancy in location pay accounts for the lower cost of living in the counties located outside of New York City. (*See* 8/12/11 Tr. at 32:11-33:12.) Defendant also argues that Plaintiffs have failed to show any racial motive or disparate impact, especially since five of the seven facilities slated to close due to budgetary concerns are located north of New York City, which employs mostly white correction officers. (*See* Fischer Decl. at ¶¶ 5, 8; Declaration of Wilfredo Perez Jr. ("Perez Decl.") at ¶ 13.) The purpose of the closing,

3

far from having discriminatory animus, was "to consolidate the state's correctional facilities based on a declining inmate population[, which would] provid[e] significant savings to New York state taxpayers." (Fischer Decl. Ex. B.) The closures would eliminate approximately 3,800 unneeded and unused beds, thereby saving taxpayers $72 million in 2011-12 and $112 million in 2012-13. (*Id.*)

The court held a hearing on August 12, 2011 regarding Plaintiffs' request for a TRO.[4] After the hearing, the court gave Plaintiffs leave to file documents relating only to Defendant's alleged discriminatory intent. (*See* 8/12/11 Tr. at 81:11-82:1; 88:4-88:6; 89:3-89:6.) The court notes that, despite its explicit instructions, Plaintiffs seem to have re-briefed their arguments and included affidavits and exhibits that address aspects of their claims other than Defendant's alleged discriminatory intent. Notwithstanding Plaintiffs' disregard of the court's explicit directive, the court has reviewed all of the submissions and taken them into consideration in reaching its decision.

## DISCUSSION

### I. Legal Standard

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter," and "[w]hether to grant a preliminary injunction or not rests in the sound discretion of the district court." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79-80 (2d Cir. 1990). The standard for obtaining a preliminary injunction and a TRO are the same. *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.")

---

[4] The court notes that, at the hearing, Plaintiffs' counsel referred to statistics and documents, none of which were filed, or provided to the court or Defendant, prior to the hearing. (*See* Tr. at 65:18-68:20, 74:12-76:20.) Nor was the court or Defendant provided notice of or declarations from witnesses Plaintiffs' counsel claimed were present and ready to testify. (*See id.*)

4

In order to justify the issuance of a TRO, the movant must show irreparable harm. *Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (citations and internal quotation marks omitted); *see also Shady v. Tyson*, 5 F. Supp. 2d 102, 106 (E.D.N.Y. 1998) ("Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award."). The applicant must show that irreparable harm is "likely" to occur, not simply that there is a "possibility" of irreparable harm. *Shady*, 5 F. Supp. 2d at 106.

Moreover, the movant generally also must show "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts. Inc.*, 598 F.3d at 35. However, when, as in the instant case, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1569 (quoting *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)); *see also Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009); *N.Y.C. Environmental Justice Alliance v. Giuliani*, 214 F.3d 65, 68 (2d Cir. 2000). Plaintiffs, in their memorandum of law, appear to erroneously apply the general preliminary injunction standard, relying on the "fair ground for litigation" prong set forth above. There can be no doubt that the action sought to be restrained here is governmental action taken in the public interest. However, either under the

general preliminary injunction standard or the more rigorous standard that actually applies here, a TRO will not issue because Plaintiffs fail to show irreparable harm.

**II.     Analysis**

   *A.  Irreparable Harm*

Plaintiffs claim that they will suffer irreparable harm because their impending loss of employment or transfer upstate will negatively impact them both financially and with regard to their personal obligations.[5] (*See* Declaration of Linda M. Cronin ("Cronin Decl.") Affidavits of Troy Booth, Steven Dorsey, Nicholas Nunez, Evangeline Phillips, Herbert Reed, Rameses Rodriguez ("Rodriguez Aff.") and Jose Sanchez (collectively, "Pls. Affs.".)  However, the injuries complained of by Plaintiffs are merely speculative as Plaintiffs have not lost their jobs and, with the exception of Plaintiff Rodriguez whose transfer order was effective August 15, 2011, have yet to be reassigned.  (*See* Pls. Affs.; 8/12/11 Tr. at 41:24-42:10.)

Both Brian Fischer, Commissioner of the New York State DOCCS, and Daniel F. Martuscello III, Director of Human Resources for the New York State DOCCS, declared in their affidavits that no correction officer was laid off as a result of the facility closures in 2009 through January 2011,[6] and that DOCCS expects that every correction officer at the seven facilities currently slated for closure will have an opportunity to work as a correction officer at another facility, chosen based on their stated preference, vacancies and their seniority.  (Fischer

---

[5] The court notes that Plaintiff Cheryl Portis-Kelley was not present at the August 12, 2011 hearing and has not submitted an affidavit due to a death in the family.  Based on the allegations set forth in the complaint and the "boiler plate" nature of the affidavits submitted by the other Plaintiffs, her purported hardships are presumed to be similar to those of the other Plaintiffs.

[6] Notably, all 23 facilities closed in 2009 through January 2011 were located north of New York City.  (*See* Fischer Decl. at ¶ 5.)

6

Decl. at ¶ 12; Martuscello Decl. I at ¶ 14; August 17, 2011 Declaration of Daniel F. Martuscello ("Martuscello Decl. II") at ¶ 8.)

Plaintiffs argue that the "reduction in force" announced several weeks ago will result in a significant reduction of minority officers statewide as the officers currently employed at Arthur Kill will lose their jobs. (*See* Perez Decl. at ¶ 7; 8/12/11 Tr. at 28:1-28:13; 51:25-52:8). Mr. Perez, Southern Region Vice President of the New York State Correctional Officers and Police Benevolent Association, grossly misstates the effect of the plan and the steps DOCCS intends to take to preserve its workforce. (*See* Perez Decl. ¶ 7.) As Mr. Martuscello explained both at the hearing and in his subsequent declaration, while the reduction in force process does abolish certain positions (specifically, the positions at the facilities to be closed), in the case of the closure of a correctional facility, the process provides "the correction officers who are occupying those positions slated to be abolished [with] an opportunity to be employed as a correction officer in position at a different correctional facility." (Martuscello Decl. II at ¶ 6; *see also* 8/12/11 Tr. at 42:7-45:15; Perez Decl. at ¶ 7.) Mr. Martuscello further explained that:

> During the course of the August 3, 2011 meetings, [Mr. Martuscello] provided staff with a packet of information relative to the reduction-in-force process as prescribed under Civil Service Law Sections 80 and 80a, and a memorandum from [Mr. Martuscello] to all permanent staff potentially impacted by facility closures as the least senior in the State (See [Martuscello Decl. II] Exhibit B). Based on the number of staff that are currently working in the title of correction officer that will be affected by the facility closures, coupled with the correction officer vacancies available at that time, [Mr. Martuscello] identified a number of correction officers that could be potentially impacted via horizontal displacement, as prescribed under the Civil Service Law. As outlined in Exhibit B [to Martuscello Decl. II,] the most senior correction officer impacted at a closure facility can be placed into a fillable vacancy at another facility or impact the least senior correction officer within the state, depending on how the affected employee ranks facilities where he/she would be willing to accept continued employment. As such, the staff who were identified as the least senior, or one of the least senior, correction officers in the state, may have to move from their current facility, however, based on our current correction officer vacancies, the plan to re-open certain closed housing units and the historic attrition rate among security

7

> staff in the department, every correction officer who may be impacted by the facility closures will have an opportunity for a correction officer position at another facility.
>
> Mr. Perez's declaration at paragraph 14 alleges that "the closing of Arthur Kill Correction Facility alone will reduce the number of minority officer[s] to approximately 15.5% percent [sic] agency wide." As was stated in [Martuscello Decl. I], it is [Mr. Martuscello's] expectation[,] given the current vacancies in the system and the plan to re-open certain closed housing units, as well as [DOCCS'] historic attrition rates that every correction officer at the seven facilities slated for closure, as well as those at other facilities that may be impacted, will have an opportunity for a correction officer position at another facility. As a result, it would be [DOCCS'] expectation that the minority workforce, just as the non-minority work force, will have the opportunity to remain employed at DOCCS and the overall makeup of our correction officer staff will remain the same.

(Martuscello Decl. II at ¶¶ 7, 8.) Thus, the possibility of lay-offs is too speculative to constitute actual and imminent harm as required for a temporary restraining order. Moreover, even if Plaintiffs were certain to lose their jobs, "[l]oss of employment does not in and of itself constitute irreparable injury" warranting injunctive relief, "[s]ince reinstatement and money damages could make [Plaintiffs] whole for any loss suffered during this period." *Savage v. Gorski*, 850 F.2d 64, 67-68 (2d Cir. 1988).

Plaintiffs' alleged harm from their expected transfer to facilities located in upstate New York is also speculative. To date, only Mr. Rodriguez has been transferred. Mr. Rodriguez stated in his declaration that he is single with no dependents, but has suffered harm due to the higher rent he must now pay. (Rodriguez Aff. at ¶¶ 2, 8.) However, he does not indicate whether he took advantage of the information provided by DOCCS as to available state housing that might be more affordable. In any event his "harm" may be remedied by the award of money damages. Notably, Mr. Rodriguez was transferred to the facility he listed as his second choice on his transfer form, which did not include any facilities within New York City. (*See id.* ¶¶ 4, 5, 6; Martuscello Decl. I Ex. B.)

Plaintiffs were given the opportunity to submit forms ranking their transfer requests, and seven out of the eight Plaintiffs have done so. There are several corrections facilities located in the downstate area, including New York City, to which the correction officers seeking to relocate may be transferred. (*See* Fischer Decl. Ex. A.) Although Plaintiffs claim that they will not be reassigned within the New York City area because they are not high enough on the relocation preference list, and the city facilities have no vacancies and are unlikely to have vacancies in the near future, (*see* Pls. Affs.; Perez Decl. at ¶ 6), these arguments are also speculative. Mr. Martuscello testified under oath at the hearing on August 12, 2011 that, even if a corrections officer is lower on the preference list now, there is a separate list that consists only of those corrections officers presently at Arthur Kill, which, starting in October 2011, will be the controlling list used to determine transfer assignments. (8/12/11 Tr. at 35:2-37:6; 42:11-45:15; 48:25-50:13; *see also* Martuscello Decl. II at ¶ 7.) Thus, the probability that one of Plaintiffs will be transferred to a facility within, or very close to, New York City, will change in October. Moreover, even if the facilities within New York City are currently full, openings could very well arise in the next few months as corrections officers within those facilities transfer to other facilities, retire, or otherwise leave their position. (8/12/11 Tr. at 45:4-45:15; *see also id.* at 50:16-51:24; Martuscello Decl. II at ¶ 8.)

Significantly, the personal hardships as well as the cost of relocation or the extra cost due to an increased commute alleged by Plaintiffs, including Plaintiff Rodriguez, resulting from a transfer upstate, can be remedied by pecuniary relief. Therefore, even if all of Plaintiffs were definitely being transferred upstate, their claims do not require the immediate injunctive relief that they seek here. *See Bardin v. USPS*, 2007 WL 3223218, at *3 (D. Vt. Oct. 29, 2007) (finding employee's logistical difficulties due to transfer of employment to a new location, while

9

unfortunate, were not sufficient to establish irreparable harm); *Fischer v. Dole*, 624 F. Supp. 468, 470-71 (D. Mass. 1985) (denying injunctive relief even where government employee was transferred to a location four hundred twenty-five miles away, especially where this employee, "upon accepting her employment [with the government] knew or should have known of the possibility of eventual transfer to another location 'for the good' of the Department").

While not included in their complaint, Plaintiffs argued during the August 12, 2011 hearing and again in their affidavits, that a transfer will cause irreparable harm and violate their right to location pay as established in the "Agreement Between the State of New York and New York State Correctional Officers and Police Benevolent Association, Inc.," (the "Agreement"). (*See* Pls. Affs.; 8/12/11 Tr. at 26:18-26:25.) Article 11.7 of the Agreement[7] does not state that an employee is guaranteed a position in a location in which he or she would be granted location adjustment compensation. Instead, the Agreement merely states that an employee will receive location pay *if* he or she is employed in the specified locations. If an employee is transferred, then he or she will no longer be located in a county in which the location pay applies and, thus, will not receive the location pay. The closure of the facility within 60 days does nothing to affect the provisions of this Article. Significantly, the Agreement makes it clear that corrections officers should not have any expectation that they will remain in any one particular facility for all time. Article 24.3 of the Agreement specifies that employees may be required to change jobs or shift assignments when "necessary to maintain the services of the department or agency involved." (Cronin Decl. Ex. C at 44.) Furthermore, any harm from the loss of location adjustment compensation is not irreparable or "substantial" warranting injunctive relief, because

---

[7] The Agreement submitted by Plaintiffs states that it expired on March 31, 2009. (*See* Cronin Decl. Ex. C at 4.) The court will address Plaintiffs' claims regarding location pay as if an agreement is currently in place with the same provision set forth in the outdated Agreement provided by Plaintiffs.

it can be resolved with monetary damages after the action has proceeded in court. *See Forest City Daly Housing, Inc.*, 175 F.3d at 153.

In sum, while Plaintiffs will undoubtedly face serious hardships if they lose their employment or are transferred to a facility upstate, those potential hardships are insufficient to show irreparable harm warranting a TRO.

### B. *Likelihood of Success on the Merits*

As Plaintiffs have failed to show irreparable harm, they are not entitled to equitable relief regardless of how likely their chances of success on the merits. Thus, the court need not make a determination as to their likelihood of success on the merits at this time. However, the court notes that Plaintiffs are not likely to succeed on the merits for several reasons. First, a Title VII claim cannot be brought against Defendant in his individual capacity, because individuals are not subject to liability under Title VII. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curium). Second, although six of the eight Plaintiffs apparently filed claims with the Equal Employment Opportunity Commission on Sunday, August 14, 2011, (*see* Cronin Decl. Ex. J), no Plaintiff has received a "right to sue" letter and there have been no allegations set forth indicating that those requirements, which are necessary for the court to have jurisdiction to hear the merits of Plaintiffs' Title VII claim, should be equitably modified by the court. *See Hladki v. Jeffrey's Consol., Ltd.*, 652 F. Supp. 388, 391-93 (E.D.N.Y. 1987) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982)). Third, Plaintiffs likely have not suffered an adverse employment action pursuant to Title VII or 42 U.S.C. § 1983, because each Plaintiff is still employed, and a transfer to another facility would not likely constitute an adverse employment action as there is no indication that their seniority, health, pension or other benefits (other than perhaps locality pay) will be diminished. *See Madera v. Metropolitan Life Ins. Co.*, 2002 WL 1453827, at *5

(S.D.N.Y. Jul. 3, 2002) ("[t]he mere fact that an employee has been transferred is not in itself sufficient to show an adverse change"); *Little v. New York*, 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998), *aff'd,* 173 F.3d 845 (2d Cir. 1999) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most."). Finally, Plaintiffs likely cannot show a discriminatory purpose or intent, because Defendant acted pursuant to the authority vested in him by the Legislature, has provided race-neutral reasons for the closure, i.e. a savings of approximately $72 million to taxpayers in 2011-12 and $112 million in 2012-13, and simultaneously announced the closure of five facilities located upstate, thereby forcing the mostly white employees at those facilities to face hardships similar to Plaintiffs here.

## CONCLUSION

In sum, Plaintiffs' motion for a TRO is denied. To be clear, this opinion only declines to issue a TRO and is not a final decision on the merits of this case. The complaint as filed by the then-*pro se* Plaintiffs is defective for the reasons stated by the court in its July 21, 2011 and July 29, 2011 Orders. Accordingly, Plaintiffs shall file an amended complaint or complaints (with the requisite filing fees), and properly serve the same on Defendant NO LATER THAN September 6, 2011.

SO ORDERED.

Dated: Brooklyn, New York
August 24, 2011

/s/
DORA L. IRIZARRY
United States District Judge