UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NICHOLAS NUNEZ, *et al.*,                                    :
                                                            :        **OPINION AND ORDER**
                          Plaintiffs,                        :        11-CV-3457 (DLI) (LB)
                                                            :
             -against-                                       :
                                                            :
ANDREW CUOMO, *Governor of the State of*                     :
*New York*, *et al.*,                                        :
                          Defendants.                        :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On July 18, 2011, plaintiffs Nicholas Nunez, Cheryl Ports-Kelly, Evangeline Phillips, Troy Booth, Steven Dorsey, Rameses Rodriguez, Herbert Reed and Jose Sanches ("Plaintiffs"), all African-American, Asian-American or Latino corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), proceeding *pro se*, filed a complaint and a motion for a temporary restraining order ("TRO") against defendant Governor Andrew Cuomo ("Governor Cuomo"), in his individual and official capacities, asking the Court, *inter alia*, to enjoin Governor Cuomo from closing the Arthur Kill Correctional Facility ("Arthur Kill") on the ground that the closure would violate Plaintiffs' equal protection rights under the Fourteenth Amendment to the United States Constitution. [1] Plaintiffs originally filed the complaint and motion for a TRO as a class action.  However, by Electronic Order dated July 21, 2011, the Court terminated the TRO, without prejudice, because Plaintiffs had not properly served Governor Cuomo and because *pro se* plaintiffs could not proceed as class

---

[1] The facts and circumstances underlying this case as previously set forth by this Court in its opinion denying the TRO motion, *Nunez v. Cuomo*, 2011 WL 3794230 (E.D.N.Y. Aug. 24, 2011), is incorporated herein by reference.  Accordingly, familiarity with the facts and record of prior proceedings is assumed and the Court only includes those additional facts alleged in the Amended Complaint that are necessary to dispose of the instant motion.

representatives.  *See, e.g., Iannoccone v. Law*, 142 F. 3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro se* means to appear for one's self, a person may not appear on another person's behalf in the other's cause.").   Plaintiffs were granted leave to re-file the TRO motion individually. Accordingly, on July 25, 2011, each *pro se* Plaintiff filed a separate TRO motion.

By July 29, 2011, Plaintiffs still had not served Governor Cuomo properly, but due to the urgency of the circumstances, the Court requested that Governor Cuomo respond to the TRO, without waiving any available defenses by doing so.  Counsel representing Mr. Nunez entered her appearance on the evening of August 11, 2011, and, during the August 12, 2011 TRO hearing, she advised the Court, and Plaintiffs confirmed, that she would represent the remaining Plaintiffs.  By Memorandum and Order dated August 24, 2011, this Court denied the TRO and granted Plaintiffs leave to file an Amended Complaint.  *See Nunez v. Cuomo*, 2011 WL 3794230 (E.D.N.Y. Aug. 24, 2011).

On September 16, 2011, Plaintiffs filed an Amended Complaint[2] against defendants Governor Cuomo, in his individual and official capacity, and the State of New York (the "State," together with Governor Cuomo, "Defendants"), seeking declaratory, injunctive, and monetary relief, alleging that the closure of Arthur Kill, and Defendants' actions related to the closure, violated their rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), the Contract Clause of the United States Constitution, the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1981, 1983, and New York State Human Rights Law, N.Y. Executive Law § 296.  Before the Court is Defendants' motion to

---

[2] Cheryl Ports-Kelly is not named as a plaintiff in the Amended Complaint, nor has she otherwise appeared in this case subsequent to the filing of the initial complaint.  As such, the Clerk of the Court is directed to terminate Ms. Ports-Kelly as a party in this case.  Notably, the Amended Complaint identifies Plaintiffs as including "all those similarly situated."  However, Plaintiffs have not moved for class certification in this case.

dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the following allegations of fact as set forth in the Amended Complaint are taken as true.  (*See generally*, Amended Complaint ("Am. Compl."), Doc. Entry No. 32.)  Plaintiffs are all "minority" corrections officers ("COs") employed by DOCCS at Arthur Kill.  (Am. Compl. ¶¶ 10-16.)  Plaintiffs allege that, before January 1, 2011, New York State Correction Law § 79-a ("Correction Law § 79-a") required one year's notice to be given prior to the closure of a correctional facility.  (*Id.* ¶ 19.)  Plaintiffs further allege that, on January 11, 2011, the New York State Legislature ("the Legislature") amended Correction Law § 79-a to increase the required prior notice of closure of a correctional facility to two years.  (*Id.* ¶ 20.)  According to Plaintiffs, on April 1, 2011, the Legislature suspended Correction Law § 79-a, at the behest of Governor Cuomo, to reduce the two-year prior notice requirement to sixty days. (*Id.* ¶ 21.)  During this same time period, on February 9, 2011, Governor Cuomo issued an Executive Order that established the Prison Closure Advisory Task Force (the "Task Force") and guidelines for the closure of DOCCS facilities.  (*Id.* ¶ 22.)  According to Plaintiffs, Governor Cuomo terminated the Task Force on March 2, 2011, "because he intended to close Arthur Kill and it did not meet his criteria as established by Executive Order."  (*Id.* ¶ 23.)

## I.    Closure of Arthur Kill

On June 30, 2011, Governor Cuomo announced the closing of seven correctional facilities, five of them located in Upstate New York and two, Fulton Correctional Facility and Arthur Kill, located in the "New York City Hub" region.  (*Id.* ¶ 24.)  Arthur Kill was scheduled for closure on December 1, 2011.  (*Id.* ¶ 57.)  Plaintiffs allege Arthur Kill is one of the most

efficient and cost effective correctional facilities in New York City with, *inter alia*, "state of the art" physical characteristics and conditions.  (*Id.* ¶¶ 25-30.)  According to Plaintiffs, the closure of Arthur Kill will have a devastating impact on all Arthur Kill COs because they will be transferred to facilities at least one hundred miles away from Arthur Kill.  (*Id.* ¶¶ 33, 35.)  Moreover, Plaintiffs contend that transfers to other facilities will cause a reduction in pay, as working in these new facilities will not entitle Plaintiffs to "location pay," which is a downstate pay adjustment for eligible employees in New York City.  (*Id.* ¶¶ 36, 49.)  In addition, the transfers will create significant relocation costs, as Plaintiffs will not be able to sell their homes and/or relocate their families from New York City, forcing Plaintiffs either to resign or relocate apart from their families and maintain two households.  (*Id.* ¶ 37.)  The State did not offer any relocation pay.  (*Id.* ¶ 38.)

Plaintiffs calculate, based on what they purport to be the most recent data released by the New York State Civil Service Commission, that 15.9% of all COs and Sergeants employed by DOCCS throughout the State are "minorities." [3]  (*Id.* ¶ 39.)  Plaintiffs allege further that 32% of the COs working in the facilities slated for closure are minorities.  (*Id.* ¶ 41.)  Thus, the closures of these facilities allegedly disproportionally impact minority COs "in that the impact is twice that of the overall minority officers employed by DOCCS."  (*Id.* ¶ 43.)

Plaintiffs maintain further that the "overwhelming majority" of minority COs work in the New York City Hub and two facilities immediately north of the New York City.  (*Id.* ¶ 44.)  There are 357 COs employed at facilities slated for closure in the New York City Hub, 277 of whom are minority.  (*Id.* ¶¶ 46-47.)  Of the 357 COs, 302 work at Arthur Kill and 225 of those

---

[3] Based "upon information and belief," but without specifying what the information is, its source, or explaining the difference in the percentages, Plaintiffs allege the actual percentage of minority COs is 12%.  (Am. Compl. ¶ 42.)

4

COs from Arthur Kill are minority.  (*Id.* ¶ 47.)  A loss of the 277 minority COs employed from DOCCS would decrease minority representation in the State by 7.5%.[4]  (*Id.*)

## II.    Collective Bargaining Agreement

Plaintiffs, "through their Collective Bargaining Agent" are parties to a collective bargaining agreement ("CBA") with the State, covering the period of April 1, 2007 through March 31, 2011.  (*Id.* ¶ 48.)  Section 11.7 of the CBA provides for location pay for employees working in New York City.  (*Id.* ¶ 49.)  The CBA "makes no reference" to involuntary transfers from a CO's assigned facility.  (*Id.* ¶¶ 50, 113.)  Plaintiffs allege that the closure of Arthur Kill violates the CBA because the closure requires Plaintiffs to transfer involuntarily to facilities that do not qualify for location pay.  (*Id.* ¶¶ 51-52.)  Plaintiffs allege they will have no way to offset the loss of location pay they will incur as a result of the prison closure.  (*Id.* ¶ 53.)  In addition, the loss of location pay will result in reduced pension benefits for Plaintiffs over the remainder of their lives.  (*Id.* ¶ 54.)

Section 22.1 of the CBA requires employers to "provide for safe working conditions . . . ."  (*Id.* ¶¶ 55, 112.)  Plaintiffs allege that, while Arthur Kill was slated for closure on December 1, 2011, the "wholesale" transfer of inmates from Arthur Kill began shortly after Plaintiffs initiated the instant suit.  (*Id.* ¶ 57.)  As a result, Arthur Kill purportedly was left in "tremendous turmoil and unrest," which concerned Plaintiffs.  (*Id.*)  Plaintiffs further contend such unrest is likely to cause rebellion and serious injury or death.  (*Id.*)  As an example, Plaintiffs allege that, on August 28, 2011, thirty inmates protested the closure of Arthur Kill and the inmates were "forcibly restrained," handcuffed, and placed in the Special Housing Unit for their and the COs'

---

[4] This assumes that the prison closures will cause all minority COs employed in the New York City Hub to lose their jobs, an allegation not made anywhere in the Amended Complaint.

safety.  (*Id.* ¶ 58.)  While noting this incident did not result in serious injury, Plaintiffs assert that "the prospect of violence is inevitable."  (*Id.*)

The planned closure of the correctional facilities includes a "Reduction in Force Plan" (the "Reduction Plan") that, according to Plaintiffs, anticipates officers will lose their jobs.  (*Id.* ¶ 62.)  Based on the Reduction Plan, a CO's transfer request will be given priority once the facility wherein the CO works has been closed.  (*Id.*)  Thus, while COs at Arthur Kill will be placed at the head of the transfer list after that facility closes, they will be behind all other officers in facilities closed before Arthur Kill who will have made transfer requests before Plaintiffs.  (*Id.*)

## III.   Less Burdensome Option and Retaliation by Defendants

Governor Cuomo stated that closing the correctional facilities would save $72 million.  (*Id.* ¶ 63.)  According to Plaintiffs, closing Arthur Kill will not result in any savings because the property upon which Arthur Kill is situated has been subject to numerous toxic waste violations, making the property ineligible for an "Adaptive Reuse Plan" as outlined in Correction Law § 79-b.[5]  (*Id.* ¶¶ 64-65.)  Plaintiffs further allege there are less burdensome methods of cutting costs, including the closure of Hudson Correctional Facility instead of Arthur Kill.  (*Id.* ¶ 66-67.)  Plaintiffs additionally assert that white COs working at facilities slated for closure in the Upstate area will not suffer the irreparable harm that Plaintiffs will suffer as a result of the closure of Arthur Kill because there are other facilities near the Upstate facilities slated to be closed to which those COs can be transferred.  (*Id.* ¶¶ 68-72.)

Plaintiffs assert that, before they filed the instant suit on July 18, 2011, no inmates or COs had been transferred from Arthur Kill.  (*Id.* ¶¶ 73-74.)  However, in retaliation for filing this

---

[5] The Court is curious how Plaintiffs can reconcile their claim that Arthur Kill is a state of the art facility that should remain in open with their assertion that Arthur Kill is situated on a toxic waste site.

suit, Plaintiffs were forced to endure a hurried attempt to close the facility, including the allegedly inappropriate transfer of inmates, and Plaintiffs were subjected to involuntary transfer or reduction in force without being provided the appropriate information and timeframes. (*Id.* ¶ 75.)

## IV.   Plaintiffs' Claims

Plaintiffs claim: 1) Defendants' actions impaired Plaintiffs' right to have Defendants comply with their contractual obligations in violation of the Contract Clause of the United States Constitution; 2) Defendants engaged in unlawful employment discrimination in violation of Plaintiffs' Title VII rights; 3) Governor Cuomo violated Plaintiffs' Fourteenth Amendment Rights under 42 U.S.C. §§ 1981 ("Section 1981") and 1983 ("Section 1983"); 4) Defendants retaliated against Plaintiffs for filing the instant suit in violation of Title VII; and 5) Defendants discriminated against Plaintiffs in their employment in violation of the New York State Human Rights Law.  (*See* Am. Compl. ¶¶ 76-114.)

## DISCUSSION

## I.   Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure states that a defendant may move, in lieu of an answer, for dismissal of a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To determine whether dismissal is appropriate, "a court must accept as true all [factual] allegations contained in a complaint" but need not accept "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  For this reason, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to insulate a claim against dismissal.  *Id.*  Moreover, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief." *Id.* at 679. (internal citations and quotation marks omitted).

Generally, consideration of a Rule 12(b)(6) motion to dismiss is limited to the complaint itself. *Faulkner v. Beer*, 463 F. 3d 130, 134 (2d Cir. 2006). However, "[c]onsideration of materials outside the complaint is not entirely foreclosed." *Id.* A court may consider statements and documents "incorporated in [the complaint] by reference," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F. 2d 42, 47 (2d Cir. 1991) (citations omitted), as well as documents "integral" to the complaint, without converting a motion to dismiss into one for summary judgment. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F. 3d 69, 72 (2d Cir. 1995); *accord Broder v. Cablevision Systems Corp.*, 418 F. 3d 187, 196 (2d Cir. 2005) (where a complaint relies on the terms of a contract, the court may look to the agreement itself on a motion to dismiss).

## II.    Analysis

### A.  Contract Clause[6]

Plaintiffs' sixth claim alleges the closure of Arthur Kill impairs Defendants' obligations under the CBA, in violation of the Contract Clause of the United States Constitution, because: 1) Plaintiffs would be transferred involuntarily from Arthur Kill despite the CBA's silence regarding involuntary transfers; 2) Plaintiffs would lose their location pay and attendant retirement credits, as set forth in the CBA, because of the involuntary transfer; and 3) the closure of Arthur Kill was proceeding in an unsafe manner, in derogation of Defendants' duties under

---

[6] Given that Plaintiffs have raised a specific claim in the Amended Complaint relating to alleged violations of the CBA, the Court may consider the CBA in deciding the instant motion. *See* discussion in Part I, *supra.*

the CBA to provide Plaintiffs with safe working conditions.  (*See* Am. Compl. ¶¶ 48-62, 104-114; *see also* Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Am. Compl. ("Pls.' Mem.") at 5-6, Doc. Entry No. 45.)  Defendants contend Plaintiffs fail to state a claim under the Contracts Clause because: 1) the CBA does not grant Plaintiffs a right to be free from involuntary transfers and, accordingly, Plaintiffs have no contractual rights that can be impaired by such involuntary transfers; and 2) Plaintiffs' claims regarding location pay and unsafe work conditions do not constitute impairments of contractual obligations but rather only amount to claims of breach of contract, for which remedies as set forth in the CBA remain available.  (*See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 10-16, Doc. Entry No. 39.) The Court finds that Plaintiffs have failed to state a claim under the Contract Clause for the following reasons.

As a threshold matter, the Eleventh Amendment to the United States Constitution bars Plaintiffs' Contract Clause claim against the State of New York.  *See Hans v. Louisiana*, 134 U.S. 1 (1890) (sovereign immunity under the Eleventh Amendment precludes suit against the state in federal court under Contract Clause of the Constitution).  As such, the claim is dismissed as to the State.  Plaintiffs may assert a claim, however, against Governor Cuomo in his official capacity as "the eleventh amendment does not bar suits against state officers to enjoin violations of federal law[.]"  *Ass'n of Surrogates & Supreme Court Reporters v. State of New York ("Surrogates")*, 940 F. 2d 766, 774 (2d Cir. 1991).  Nonetheless, Plaintiffs' claims against Governor Cuomo under the Contract Clause are meritless.

Article I, Section 10, Clause 1 of the United States Constitution provides, in pertinent part, that "[N]o State shall . . . pass any . . . Law impairing the Obligations of contracts."  While the language of the Contract Clause is absolute on its face, "[i]t does not trump the police power

of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals.'" *Buffalo Teachers Fed'n v. Tobe*, 464 F. 3d 362, 367 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978)).  As such, "courts must accommodate the Contract Clause with the inherent police power of the state to safeguard the vital interests of its people."  *Id.* (citations and internal quotation marks omitted).

To state a viable Contract Clause claim, a complaint must allege sufficient facts demonstrating that a state law has "operated as a substantial impairment of a contractual relationship."  *Harmon v. Markus*, 412 F. App'x 420, 423 (2d Cir. 2011) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).  There are three components to this inquiry: 1) whether a contractual relationship exists; 2) whether a change in law impairs that contractual relationship; and 3) whether the impairment is substantial.  *Id.*  However, even state laws that do substantially impair contractual obligations do not necessarily give rise to viable Contract Clause claims.  *See Buffalo Teachers Fed'n*, 464 F. 3d at 368 (citing *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 16 (1977)); *see also Surrogates*, 940 F. 2d at 772 ("[F]inding an impairment of contract is merely a threshold step toward resolving the more difficult question whether that impairment is permitted under the Constitution." (internal citation and quotation marks omitted)).

A state law that impairs a contractual obligation will not be deemed unconstitutional so long as: 1) it serves a demonstrated legitimate public purpose, such as remedying a general social or economic problem; and 2) the means chosen to accomplish the public purpose is reasonable and necessary.  *See CFCU Cmty. Credit Union v. Hayward*, 552 F. 3d 253, 267 (2d Cir. 2009) (citations omitted); *see also Buffalo Teachers Fed'n*, 464 F. 3d at 368 (citations omitted).  Here, there is no dispute that the CBA creates a contractual relationship between Plaintiffs and Defendants.  However, the Court finds the Amended Complaint fails to allege facts showing that

10

the closure of Arthur Kill impairs that contractual relationship.

     i.  <u>Involuntary Transfer</u>

It is axiomatic that the Contract Clause cannot be employed to acquire benefits not bargained for in the contract itself.  *See, e.g., Louisiana ex rel. Nelson v. Police Jury*, 111 U.S. 716, 720 (1884) ("As the contract clause of the constitution was intended to secure the observance of good faith in the stipulation of parties against state action, it could not be invoked when no such stipulation existed . . .").  Thus, a party cannot state a Contract Clause claim where there is no "contractual agreement regarding the specific . . .  terms allegedly at issue." *Gen. Motors Corp.*, 503 U.S. at 186; *accord RUI One Corp. v. City of Berkeley*, 371 F. 3d 1137, 1147 (9th Cir. 2004) ("The first sub-inquiry is not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific . . . terms allegedly at issue.'" (internal citation omitted)).  While the contractual term may be express or implied, *Gen. Motors Corp.*, 503 U.S. at 188, the term will only be implied where it is "clearly part of the bargained-for agreement."  *RUI One Corp*., 371 F. 3d at 1149.  Moreover, the extent to which a contractual term may be implied in this context is limited by the principles that "the legislature cannot bargain away the police power of a State" and that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."  *U.S. Trust Co.*, 431 U.S. at 23 (quoting *Stone v. Mississippi*, 101 U.S. 814, 817 (1880)).

Here, Plaintiffs allege in their Amended Complaint, and reassert in their memorandum of law, that the CBA "makes no reference to involuntary transfers from the [COs'] assigned facility."  (Am. Compl. ¶¶ 50, 113; Pls.' Mem. at 6.)  Plaintiffs further contend that the CBA gives the State the right to make any necessary job or shift assignments within a facility, "in

11

accordance with seniority, to maintain the services of the department or agency involved." (*Id.* (citing CBA § 24.3, annexed as Ex. C to Aug. 14, 2011 Declaration of Linda M. Cronin ("Cronin Decl.").)  Based on these alleged facts, Plaintiffs conclude that the closure of Arthur Kill violates the CBA because the closure subjects Plaintiffs to an involuntary transfer to another facility. (Am. Compl. ¶ 51; Pls.' Mem. at 6.)  Even drawing all reasonable inferences from the facts alleged in the Amended Complaint in favor of Plaintiffs, at best it appears Plaintiffs' argument is as follows:  because the CBA is silent regarding involuntary transfers of COs between facilities, but expressly allows Defendants to reassign COs within a facility, then the CBA must provide COs the right not to be involuntarily transferred to a new facility.  Thus, it follows that the closure of Arthur Kill impairs this right.  Such conclusory arguments and legal deductions cannot survive a motion to dismiss.  *See Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161, 174-175 (2d Cir. 2005) ("Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, conclusions of law or unwarranted deductions of fact are not admitted." (internal citation omitted)).

Plaintiffs have not alleged any facts to support their claim that the CBA, either expressly or impliedly, gives COs the right to be free from involuntary transfers.  Rather, Plaintiffs' assertion is belied by the agreement itself.  Article 6 of the CBA states:  "Except as expressly limited by other provisions of this Agreement, all of the authority, rights and responsibilities possessed by [the State] are retained by it."  There is no doubt that the State's sovereign authority to administer the operation of its correctional facilities is an essential police power retained by it and not limited by the CBA.  *See CFCU Cmty. Credit Union*, 552 F. 3d at 266 (citation omitted) (The police power is "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people[.]").  In addition, as Defendants note,

and, as independent review by the Court confirms, there are no sections in the CBA that limit either the State's right to close facilities or transfer COs when such closures occur.  (*See generally*, CBA.)  Moreover, like the current law, the version of New York Correction Law in force at the time the CBA period began[7] expressly gave the Commissioner of DOCCS[8] the discretion to maintain, add, or close correctional facilities.  *See* N.Y. Correction Law § 70(3)(a) (McKinney's 2007)  ("The commissioner may continue to maintain . . . and may add to or close any [correctional facility], and may establish and maintain new correctional facilities, in accordance with the needs of the department. . .").  Because N.Y. Correction Law § 70(3)(a) was in force "at the time and place of the making of a contract" that law "enter[s] into and form[s] a part of [the CBA], as if [it] were expressly referred to or incorporated in its terms."  *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429-30 (1934).  Accordingly, not only is there no section in the CBA limiting Defendants' right to close correctional facilities and transfer COs after such closure, but the Commissioner of DOCCS' authority to close correctional facilities was, by operation of law, incorporated as an express term in the CBA.  It necessarily follows that, in order to exercise this authority that is incorporated into the CBA, Defendants must also retain the power to transfer COs and other staff from a correctional facility they intend to close to one they intend to keep open.

Plaintiffs have failed to plead any facts supporting their claim that the CBA's silence regarding "involuntary transfers" either expressly or impliedly gives them a contractual right to be free from involuntary transfers.  Hence, this claim is dismissed as they have failed to state a claim that the closure of Arthur Kill impairs this right.  *See General Motors Corp.*, 503 U.S. 186-

---

[7] The CBA covers the period of April 1, 2007 through March 31, 2011.  (Am. Compl. ¶ 48.)

[8] The Commissioner of DOCCS is appointed by and holds office at the pleasure of Governor Cuomo.  *See* N.Y. Correction Law § 5(1).

187 ("[W]e need not reach the questions of impairment, as we hold that there was no contractual agreement regarding the specific . . . terms allegedly at issue.").

    ii.  <u>Location Pay and Unsafe Work Conditions</u>

Plaintiffs claim the closure of Arthur Kill impairs their contractual right to receive location pay and they will have no way to offset the resulting loss of income.  (Am. Compl. ¶¶ 49, 52-54, 111; Pls.' Mem. at 6.)  Plaintiffs also contend that the closure is being done in a hurried manner, impairing their right to be provided safe working conditions.  (Am. Compl. ¶¶ 55, 112; Pls.' Mem. at 6.)  Neither of these assertions states a claim for relief under the Contract Clause.

The Contract Clause is not implicated when state action constitutes a breach of a contract rather than an impairment of a contractual obligation.  *See TM Park Ave. Assocs. v. Pataki*, 214 F. 3d 344, 349 (2d Cir. 2000).  ("[I]t is necessary to distinguish between legislative action that merely breaches the contract and legislative action that impairs it, for only the latter is cognizable under the United States Constitution.")  The distinction between a breach of contract and an impermissible impairment "depends on the availability of a remedy in damages."  *Id.* (citing *E & E Hauling, Inc. v. Forest Preserve Dist.,* 613 F. 2d 675, 679 (7th Cir. 1980).)  Thus, where a remedy remains available to the aggrieved party, only a breach of contract has occurred and there is no Contract Clause violation.  *Id.* ("If a contract is merely breached and the duty to pay damages remains, then the obligation of the contract remains and there has been no impairment."); *cf. Redondo Const. Corp. v. Izquierdo*, 662 F. 3d 42, 48 (1st Cir. 2011) (citations omitted) ("If a state breaches a contract but does not impair the counterparty's right to recover damages for the breach, the state has not impaired the obligation of the contract.").

Here, Plaintiffs only make conclusory allegations, which this Court need not accept as

true for the purposes of this motion, that remedies are unavailable to them for the purported breach of the CBA. (*See* Am. Compl. ¶ 53 (Plaintiffs "have no way to offset the substantial loss of income they will incur[.]"); *see also Id.* ¶ 60 (Plaintiffs "have no adequate or speedy remedy at law for the unconstitutional conduct of Defendants[.]").) Indeed, the CBA by its express terms contradicts Plaintiffs' conclusory assertions because it provides a means by which Plaintiffs may seek remedies for the alleged breaches of the CBA.

Specifically, Plaintiffs' assertion that Section 11.7 of the CBA grants them an irrevocable right to location pay adjustment, regardless of the location of the correction facility in which they are employed, raises a question of the proper interpretation of that section of the CBA. Article 7 of the CBA provides a grievance procedure to address disputes arising from the CBA. The CBA specifically provides: "A dispute concerning the application and/or interpretation of this Agreement is subject to all steps of the grievance procedure . . ." (CBA § 7.1(a).) Plaintiffs have not alleged that this grievance procedure has been foreclosed to them or that any attempt by them to pursue such grievance process has been interfered with by Defendants. It is apparent that Plaintiffs never attempted to avail themselves of the CBA grievance process.

The CBA also provides Plaintiffs a remedy for Defendants' purported violation of their obligation to provide safe working conditions. Article 22 of the CBA covers safe working conditions and Section 22.5 provides: "Grievances alleging failure to comply with [the Safe Working Conditions Article] shall be processed pursuant to Article 7, paragraph 7.1(b)." (CBA § 22.5.) Moreover, the CBA provides that safety issues, not including staffing concerns, "may be referred to an Agency Level Statewide Safety and Health Committee." (CBA § 7.2(a)(3).) As with the location pay adjustment claim, Plaintiffs have not alleged that this grievance procedure was foreclosed to them or that that any attempt by them to pursue such grievance

process has been interfered with by Defendants.   Accordingly, to the extent that Plaintiffs arguably were subjected to unsafe work conditions, redress is available to them.

Plaintiffs have failed to plead facts showing the unavailability of remedies for the purported violations of the CBA.   In fact, the CBA does provide a remedy for both of the purported violations.   Plaintiffs, thus, have failed to allege an impairment of Defendants' contractual obligations.   Accordingly, Plaintiffs' location pay and safe work conditions Contract Clause claims are dismissed.   *See Montauk Bus Co. v. Utica City Sch. Dist.*, 30 F. Supp. 2d 313, 320 (N.D.N.Y. 1998) (Plaintiff failed to state a Contract Clause claim where it "has not alleged the unavailability of damages or any other impairment of its contractual rights[.]").

### B.  *Title VII Disparate Impact Claim*

As part of their first claim, Plaintiffs allege Defendants engaged in unlawful employment practices, as defined by 42 U.S.C. § 2000e-2, resulting in a disparate impact on Plaintiffs in violation of their Title VII rights.  (Am. Compl. ¶¶ 77-81.)  As a threshold matter, a Title VII claim cannot be brought against Governor Cuomo in his individual capacity, "because individuals are not subject to liability under Title VII."  *See Wrighten v. Glowski*, 232 F. 3d 119, 120 (2d Cir. 2000) (per curium) (citing *Tomka v. Seiler Corp.*, 66 F. 3d 1295, 1313 (2d Cir. 1995)).  Consequently, to the extent Plaintiffs allege a Title VII claim against Governor Cuomo in his individual capacity, that claim is dismissed.  Moreover, for the reasons discussed below, Plaintiffs' disparate impact claims against the State and Governor Cuomo in his official capacity are also dismissed.

Under a Title VII disparate impact theory of liability, a plaintiff must show that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(k)(1)(A)(i).  To make out a

disparate impact claim a plaintiff must: 1) identify a specific employment practice or policy; 2) demonstrate that a disparity exists; and 3) establish a causal relationship between the two.  *Chin v. Port Auth. of N.Y. & N.J.*, ⸺ F.3d ⸺, 2012 WL 2760776, at *10 (2d Cir. July 10, 2012) (internal citation and quotation marks omitted).

In addition, the statistics a plaintiff proffers in support of a disparate impact claim "must reveal that the disparity is substantial or significant," and "must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F. 3d 147, 160 (2d Cir. 2001) (internal quotation marks omitted); *accord Rodriguez v. Beechmont Bus Service, Inc.*, 173 F. Supp. 2d 139, 148 (S.D.N.Y. 2001) (to state a disparate impact claim under Title VII, a plaintiff must identify a neutral employment policy with a statistically significant adverse impact). Furthermore, when offering statistics, "plaintiffs must identify the *correct* population for analysis." *Smith v. Xerox Corp.*, 196 F. 3d 358, 368 (2d Cir. 1999) (emphasis added), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F. 3d 134, 140 (2d Cir. 2006). Thus, for example, in the context of work place promotions, "the appropriate comparison is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted." *Malave v. Potter*, 320 F. 3d 321, 326 (2d Cir. 2003).  However, where the comparison includes a non-relevant population as part of the analysis, that comparison and analysis "do not meet the statistical standards prescribed by law." *Chin*, ⸺ F. 3d  at ⸺, 2012 WL 2760776, at *12.

In their Amended Complaint, Plaintiffs identify Defendants' June 30, 2011 announcement to close seven correctional facilities, including Arthur Kill, as the specific employment practice or policy that constitutes the basis of their disparate impact claim.  (*See,*

17

*e.g.,* Am. Compl. ¶ 24; Pls.' Mem. at 10.)  As such, Plaintiffs have satisfied the first element of their claim.  Plaintiffs further allege that the closures worked a disparate impact on minority COs in two respects:  1) the closures resulted in disproportionately greater layoffs of minority COs when compared with white COs; and 2) Plaintiffs suffered a greater hardship than white COs because the closures required Plaintiffs to transfer to facilities "considerably further away than the similarly situated upstate affected correction officers."  (Am. Compl. ¶¶ 33, 35-37, 51, 80; Pls.' Mem. at 9-11.)

Before squarely addressing the remainder of Plaintiffs' claim, the Court briefly notes that Plaintiffs alleged in their Amended Complaint that 68% of the COs employed in facilities that were scheduled to be closed are white, while 32% of those COs are minority.  (Am. Compl. ¶ 41.)  Plaintiffs now allege, based on new calculations using "raw data" provided by Defendants, that "only 57% of the officers at the seven affected facilities are white and 43% are minorities." (Pls.' Mem at 9.)  Plaintiffs conclude this new calculation "only serves to strengthen [their] claim of disparate impact."  (*Id.*)  Defendants argue that Plaintiffs' newly proffered statistics are inapposite.  Specifically, Defendants assert the new statistics are based on data that accounts for the ethnicity of *all* DOCCS employees, civilian staff and uniformed corrections officers, while the relevant population at issue in this case is only uniformed corrections officers.  (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss ("Defs.' Rep. Mem.") at 4-5, Doc. Entry No. 48.)  Without deciding the issue, it appears that Plaintiffs' newly proffered statistics fail to meet the standard prescribed by law.  *See Chin*, —— F. 3d  at ——, 2012 WL 2760776, at *12 (statistical analysis fails to meet the standards prescribed by law where the relevant population for analysis includes only a subset of a particular population, but the analysis actually uses the entire population).  Ultimately, the issue is of no moment, because, as set forth below,

regardless of the statistics relied upon, the Court finds Plaintiffs have failed to allege facts sufficient to meet the remaining elements of their disparate impact claim.

Plaintiffs first allege the closure of Arthur Kill will cause a disproportionate number of layoffs of minority COs in comparison to similarly affected white COs at closing upstate facilities.   (Pls.' Mem. at 9.)   Specifically, Plaintiffs contend the closure of Arthur Kill will result in the layoff of 27 out of 211 COs.   (Pls.' Mem. at 9-10.)   However, even assuming, *arguendo*, that minority COs at Arthur Kill would be laid off in disproportionate numbers, Plaintiffs neither allege that they are among the 27 COs who allegedly would lose their employment[9] nor do they allege any facts, other than two conclusory allegations, which this Court need not take as true, that they personally would be, or have been, laid off because of the closure.  (*See* Am. Compl. ¶ 37 ("The vast majority of Arthur Kill officers . . . will be forced to resign or relocate . . ."); *see Id.* ¶ 80 (" . . . irreparable harm and injury will result as a result of losing their jobs . . . and/or being forced to resign . . .").)

Plaintiffs have not alleged facts showing the closure of Arthur Kill will or has caused personal injury in the form of layoffs.  Hence, Plaintiffs have failed to state a disparate impact claim premised upon the alleged layoff of minority COs.  *See, e.g., Bacon v. Honda of Am. Mfg., Inc.*, 370 F. 3d 565, 577 (6th Cir. 2004) (collecting cases) (noting that, as a basic requirement of standing, to state a disparate impact claim, a plaintiff must show that a facially neutral policy caused discrimination that resulted in personal injury); *Melendez v. Illinois Bell Telephone Co.*, 79 F. 3d 661, 668 (7th Cir. 1996) ("In order for an individual plaintiff to have constitutional standing to bring a Title VII action, he must show that he was personally injured by the

---

[9] Indeed, Defendants affirm that, of the eight original plaintiffs in this action only Evangeline Phillips was laid off, effective December 1, 2011.  She subsequently was rehired on December 9, 2011.  (*See* Mar. 14, 2012 Decl. of Daniel F. Martuscello III ("Martuscello Mar. 14, 2012 Decl.") ¶ 12, Doc. Entry No. 49.)

defendant's alleged discrimination and that his injury will likely be redressed by the requested relief."); *see also Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates, Co.*, 436 F. 3d 82, 85 (2d Cir. 2006)) (To satisfy Article III standing requirements "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (*quoting Allen v. Wright*, 468 U.S. 737, 751 (1984)).

To the extent Plaintiffs attempt to state a disparate impact claim on behalf of those minority COs who purportedly will be laid off, that claim is without merit. Despite including the phrase "and all those similarly situated" in the caption of their Amended Complaint, Plaintiffs never moved to certify this action as a class action. Accordingly, Plaintiffs have no standing to seek a remedy for the purported layoffs of alleged similarly situated COs. Moreover, assuming, *arguendo*, Plaintiffs in this action were suitable named representative plaintiffs of a certified class, their claim still would fail because "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citation and internal quotation marks omitted). Plaintiffs have failed to allege facts showing they were or will be personally injured by the purported layoffs of minority COs from Arthur Kill, and, as such, they have failed to state a disparate impact claim premised upon the purported layoffs.

Plaintiffs further claim the closure of Arthur Kill will have a disparate impact because it requires Plaintiffs to transfer to facilities at least one hundred and three miles away, whereas the vast majority of similarly affected white COs will be transferred to facilities only requiring a one-way commute of approximately fifteen to twenty miles. (Am. Compl. ¶ 35; Pls.' Mem. at 10-11.) Plaintiffs argue that they have made a colorable disparate impact claim because the

Second Circuit has "established that a mere transfer from one location to another is sufficiently adverse to give rise to a claim of discrimination." (Pls.' Mem. at 10 (citing *Patrolmen's Benevolent Ass'n v. New York City*, 310 F. 3d 43 (2d Cir. 2002).) However, as discussed below, Plaintiffs misrepresent[10] the Second Circuit's holding in *Patrolmen's Benevolent Association*. As discussed further below, Plaintiffs' disparate impact claim fails to state a claim upon which relief can be granted, as it is premised solely upon the distance of Plaintiffs' commute or relocation.

Contrary to Plaintiffs' argument, the Second Circuit in *Patrolmen's Benevolent Association* did not establish a rule that a lateral transfer *alone* gives rise to a discrimination claim; rather, the Court held that a lateral transfer that also materially and negatively alters the terms and conditions of one's employment *may* constitute an adverse employment action. *See Patrolmen's Benevolent Ass'n*, 310 F. 3d at 51 ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way."). A change in working conditions is materially adverse when it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mathirampuzha v. Potter*, 548 F. 3d 70, 78 (2d Cir. 2008) (citation and quotation marks omitted). Examples of materially adverse changes include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

---

[10] At this juncture, the Court is constrained to note that Plaintiffs' brief is rife with misstatements and misrepresentations of the law. Indeed, at times it has been difficult to decipher the point being made, given the lack of complete sentences or complete thoughts conveyed in those phrases. Moreover, the Court is disturbed by Plaintiffs' apparent misrepresentations of the facts and the circumstances surrounding the case. Notwithstanding these concerns, the Court has endeavored to draw, as it must under the law, the strongest reasonable inferences in favor of Plaintiffs it can based upon the discernible claims made in the Amended Complaint and arguments made in Plaintiffs' opposition brief.

responsibilities, or other indices unique to a particular situation."   *Id.* (citation and quotation marks omitted).

To survive a motion to dismiss, it was incumbent upon Plaintiffs to allege facts in their Amended Complaint from which this Court could reasonably infer that their lateral transfers to upstate facilities changed the terms or conditions of their employment in materially adverse ways.   However, Plaintiffs have made no such allegations.   They did not allege, for example, that, along with the transfer, they would be demoted or placed in positions with less growth opportunities or placed in a facility with more dangerous working conditions or that the transfer reduced their seniority in some way.   Instead, Plaintiffs rest solely on the contention that they "are being required to transfer considerably further away" than similarly affected white COs. (Pls.' Mem. at 11.)   However, the fact that Plaintiffs have been transferred a far distance, in and of itself, is an insufficient basis upon which to make a justiciable disparate impact claim.   Indeed, as courts in this Circuit have previously noted, "[t]he mere fact that an employee has been transferred is not in itself sufficient to show an adverse change."   *Madera v. Metropolitan Life Ins. Co.*, 2002 WL 1453827, at *5 (S.D.N.Y. July 3, 2002); *accord Little v. New York*, 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998), *aff'd*, 173 F. 3d 845 (2d Cir. 1999) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most.").   Accordingly, Plaintiffs' disparate impact claim premised upon the distance of Plaintiffs' lateral transfers is dismissed.

*C.   Intentional Discrimination Under Title VII and Sections 1981 and 1983*

As part of their first claim, Plaintiffs also allege that Defendants intentionally discriminated against them, in violation of Title VII, when Defendants revoked certain

legislation and closed Arthur Kill.  In addition, for their second and third claims brought under Section 1981 and Section 1983, respectively, Plaintiffs allege that Governor Cuomo's decision to terminate the Task Force and close Arthur Kill was animated by discriminatory intent, in violation of their Fourteenth Amendment equal protection and due process rights.[11]  As the same core standards are applied to intentional discrimination claims brought under Title VII, Section 1981, and Section 1983 equal protection claims, the Court reviews Plaintiffs' intentional discrimination claims together.  *See Patterson v. Cnty. of Oneida*, 375 F. 3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause.").

Intentional discrimination occurs where a "decisionmaker ... select[s] or reaffirm[s] a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Red Earth LLC v. United States*, 657 F. 3d 138, 146 (2d Cir. 2011) (quoting *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)).  Accordingly, to survive a motion to dismiss, the factual allegations in Plaintiffs' complaint must permit this Court to draw the reasonable inference that Defendants revoked the legislation and closed Arthur Kill because of, and not simply in spite of, Plaintiffs' status as minority corrections officers.  *See Iqbal*, 556 U.S. at 676-77; *see Id.* ("[T]o state a claim . . .  respondent must plead sufficient factual matter to show that petitioners adopted and implemented the . . . policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national

---

[11] Unlike Title VII claims, Section 1981 claims and Section 1983 can be brought only under an intentional discrimination theory of liability.  *See Reynolds v. Barrett*, —— F.3d ——, 2012 WL 2819351, at * 5 (2d Cir. July 11, 2012); *see also Patterson v. Cnty. of Oneida*, 375 F. 3d 206, 226 (2d Cir. 2004) ("[A] plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." (citations omitted)).

origin.").  Moreover, in assessing the plausibility of Plaintiffs' claims, the Court is mindful that a factor to consider is whether more likely or alternative explanations for the alleged conduct exist. *Id.* at 681 ("But given more likely explanations, [the allegations] do not plausibly establish [discriminatory] purpose."); *see also Twombly*, 550 U.S. at 567–68 (finding plaintiff's allegations did not suggest an antitrust conspiracy in light of an "obvious alternative explanation" for the allegations contained in the complaint).  In applying this standard, the Court finds Plaintiffs have failed to allege facts that plausibly state an intentional discrimination claim. Accordingly, those claims are dismissed.

Plaintiffs argue that Defendants' actions leading up to the closure of Arthur Kill "more than plausibly imply" that Defendants acted with discriminatory intent in closing Arthur Kill. (Pls.' Mem. at 12-13.)  Plaintiffs specifically allege that, on January 11, 2011, the Legislature amended Correction Law § 79-a to increase the prior notice of closure of a correctional facility from one year to two years.  (Am. Compl. ¶ 20.)  Defendants validly contest the veracity of this allegation.  (*See* Defs.' Rep. Mem. at 8 (asserting "[t]here never was an increase in the closing period from one to two years")).  As Defendants accurately contend, the version of Correction Law § 79-a in effect in 2011 required one and *not* two years' notice prior to closing a prison.  *See* N.Y. Correction Law § 79-a(3) (McKinney's 2011) (requiring the commissioner to provide notice by certified mail at least twelve months prior to the closure of any correctional facility).

Plaintiffs also contend that, on February 9, 2011, Governor Cuomo issued an Executive Order establishing the Task Force and guidelines for the closure of DOCCS facilities, which he revoked on March 2, 2011, allegedly "because he intended to close Arthur Kill and it did not meet his criteria as established by Executive Order."  (*Id.* ¶¶ 22, 23.)  On April 1, 2011, the Legislature allegedly suspended Correction Law § 79-a, at the request of Governor Cuomo, in

order to allow for only a sixty-day prior notice of closure of a correctional facility.[12]   (*Id.* ¶ 21.)
Plaintiffs further argue that Defendants knew closing Arthur Kill would disparately impact
Plaintiffs and other minority COs.  (Pls.' Mem. at 13.)  Plaintiffs assert that Defendants thus
revoked the Task Force with discriminatory intent "for the sole purpose of attempting to
obfuscate the discriminatory impact on the minority officers assigned to Arthur Kill."  (Pls.'
Mem. at 12; *see also Id.* at 13 ("Defendants' actions in revoking legislation, which was enacted
for the purpose of establishing standards for closing facilities more than plausibly imply that they
acted with discriminatory intent, with actual knowledge of the disparate impact that the closing
of Arthur Kill would have.").)  Thus, it appears the gravamen of Plaintiffs' claim is that
Defendants intentionally discriminated against Plaintiffs by revoking the Task Force and
changing the amount of prior notice required to close a correctional facility for the purpose of
hiding the disparate impact that the closure of Arthur Kill would have on minority COs.

The Court first notes that, with respect to the intentional discrimination claims, the
Amended Complaint contains a number of allegations that are conclusory and, therefore, not
entitled to the assumption of truth.  *Iqbal*, 556 U.S. at 678.  For example, the allegation that
Governor Cuomo revoked the Task Force because "he intended to close Arthur Kill and it did
not meet his criteria as established by Executive Order" is simply a conclusory assertion that is
not supported by any factual allegations in the Amended Complaint.  (*See* Am. Compl. ¶ 23.)
Similarly, the Amended Complaint contains many "bare assertions . . .  amount[ing] to nothing
more than a formulaic recitation of the elements of a constitutional discrimination claim,"

---

[12] The logical extension of Plaintiffs' unsupported assertion in this regard is that the Legislature
also had some nefarious discriminatory intent or was complicit with the Governor in shortening
the notice period, an allegation not set forth in the Amended Complaint.  However, the
implication that the Governor somehow exerted his influence on the Legislature to embark on
discriminatory acts towards the minority COs at Arthur Kill is an unsupported, speculative
conclusion the Court cannot consider in determining the instant motion.

*Iqbal*, 556 U.S. at 681 (internal quotation marks omitted), such as the allegation that: 1) "Defendants discriminated against Plaintiffs by engaging in severe and pervasive employment actions . . ." (Am. Compl. ¶ 77); 2) Governor Cuomo "subjected Plaintiffs to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States . . ." (*Id.* ¶ 83); and 3) Governor Cuomo "embarked on a course of conduct that deprived Plaintiffs of their rights under the United States Constitution . . . ." (*Id.* ¶ 88.)  These assertions are legal conclusions that are not supported by factual allegations in the Amended Complaint.  As such, the Court does not consider these conclusory allegations when assessing the intentional discrimination claims.  *See Hayden v. Paterson*, 594 F. 3d 150, 162 (2d Cir. 2010) (setting aside conclusory allegations made in intentional discrimination claim).

With these conclusory allegations set aside, the Court reviews the remainder of the Amended Complaint to determine whether Plaintiffs have plausibly asserted an intentional discrimination claim.  As noted, *supra*, Plaintiffs must show discriminatory intent or purpose to state a claim for intentional discrimination.  But, "[b]ecause discriminatory intent is rarely susceptible to direct proof," a party may state an intentional discrimination claim based on circumstantial evidence of intent, such as the disparate impact the complained of conduct has on a particular group.  *See Hayden*, 594 F. 3d at 163 (internal quotation marks omitted); *Id.* ("The impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." (citation and internal quotation marks omitted)).  However, unless a "clear pattern, unexplainable on grounds other than race, emerges . . .  impact alone is not determinative, and the Court must look to other evidence."  *Id.* (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (footnotes omitted)); *Id.* (noting

that "disproportionate impact must be traced to a *purpose* to discriminate on the basis of race" (emphasis in original) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. at 260)).

Here, Plaintiffs assert Defendants intentionally discriminated against them because they wanted to hide the disparate impact that closing Arthur Kill would have on minority COs. However, Plaintiffs fail to make any allegations showing that Defendants revoked the Task Force, reduced the time needed to provide notice of a prison closure, and closed Arthur Kill, because of, and not merely in spite of, Plaintiffs' status as minority corrections officers. In addition, to the extent Plaintiffs attempt to allege that the purported disparate impact of the prison closures on minority COs constitutes evidence of Defendants' intentional discrimination, Plaintiffs make no allegations tracing the disparate impact "to a *purpose* to discriminate on the basis" of their status as minority COs, as they are required to do. *See Hayden*, 594 F. 3d at 164 (emphasis in original) (citation and internal quotation marks omitted). Accordingly, on this basis alone, the Court finds Plaintiffs have failed to state a plausible claim of intentional discrimination.

Moreover, not only have Plaintiffs failed to allege a discriminatory purpose, but Defendants provide an "obvious alternative explanation" to support the non-discriminatory nature of the complained of conduct. *See Iqbal*, 556 U.S. at 682 (citation and internal quotation marks omitted). Specifically, as Plaintiffs concede, Governor Cuomo explained that the seven correctional facilities were closed to eliminate approximately 3,800 unneeded and unused beds, thereby saving taxpayers $72 million in 2011-12 and $112 million in 2012-13. (*See* Am. Compl. ¶ 63; *see also* Aug. 4, 2011 Decl. of Brian Fischer ("Fischer Decl.") Ex. B, Doc. Entry No. 19.) Moreover, with respect to Plaintiffs' conclusory assertion that Defendants revoked legislation to obfuscate the discriminatory impact that the prison closing would have on Plaintiffs, Defendants

explain that Governor Cuomo originally "create[d] a task force to coincide with his 2011-2012 Executive Budget proposal . . . [h]owever, as enacted in the final 2011-2012 Executive Budget, the ultimate authority was given to the Governor, thus eliminating the need for the Executive Order, which the Governor ultimately rescinded."  (Defs.' Rep. Mem. at 8.)  The language of the 2011-2012 Enacted Budget and the relevant Executive Order wholly bear out Defendants' explanations.

Notably, on a motion to dismiss, courts may consider "matters of which judicial notice may be taken[.]" *Halebian v. Berv*, 644 F. 3d 122, 131 n.7 (2d Cir. 2011) (citation and internal quotation marks omitted).  As such, in considering Defendants' motion, this Court takes judicial notice of the 2011-2012 budget enacted by the Legislature and Executive Order Nos. 7 and 13 issued by Governor Cuomo.  On February 9, 2011, Governor Cuomo issued Executive Order No. 7 (9 NYCRR 8.7), which established the Prison Closure Advisory Task Force.  However, the budget for fiscal year 2011-2012, Chapter 57, Part C of the Laws of 2011, enacted by the Legislature, effective April 1, 2011, authorized Governor Cuomo to close correctional facilities ". . . as he determines to be necessary for the cost-effective and efficient operation of the correctional system, provided that the governor provides at least 60 days notice prior to any such closures . . . ."  Accordingly, by Executive Order No. 13 (9 NYCRR 8.13), dated April 5, 2011, Governor Cuomo revoked the Order establishing the Task Force, in part because, as Executive Order No. 13 states:  "the final budget passed by the Legislature and enacted by Chapter 57 of the Laws of 2011 grants the Governor discretion to determine which State-operated correctional facilities to close during fiscal year 2011-2012, without the need for recommendations from a Task Force[.]"

Plaintiffs have failed to put forth any adequately supported factual allegations as to Defendants' discriminatory intent in either revoking the Task Force or closing Arthur Kill, despite Defendants' obvious alternative explanation.   Accordingly, the Court finds Plaintiffs have failed to state plausibly claims of intentional discrimination, which are hereby dismissed.

### D.  Title VII Retaliation Claim

As their fourth claim, Plaintiffs assert that Defendants retaliated against them, in violation of Title VII's antiretaliation provision, 42 U.S.C. § 2000e–3(a), for exercising their First Amendment rights to file the instant lawsuit by, *inter alia*, closing Arthur Kill in a hurried manner after the lawsuit was filed.  (*See* Am. Compl. ¶¶ 73-75, 93-97.)  Defendants argue the retaliation claim should be dismissed because it is premised solely on conclusory and unsupported allegations.  (*See* Defs.' Mem. at 17.)  For the reasons discussed below, the Court is constrained to find that Plaintiffs have pled facts sufficient to state a retaliation claim in the narrow context of a Rule 12(b)(6) motion to dismiss.  Accordingly, Defendants' motion is denied only with respect to this claim.

The antiretaliation provision of Title VII "forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("*Burlington*") (citing § 2000e–3(a)).  The scope of the antiretaliation provision is limited to those "employer actions that would have been materially adverse to a reasonable employee or job applicant."  *Id.* at 57; *see also Id.* at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth a general civility code for the American workplace." (citation and internal quotation marks omitted)

(emphasis in original)).   Thus, to fall within the purview of the antiretaliation provision, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."   *Id.* at 57; *see also Millea v. Metro-North R.R. Co.*, 658 F. 3d 154, 165 (2d Cir. 2011) (Noting that "[t]o separate the significant from the trivial, the *Burlington Northern* standard employs an 'objective' test, which considers whether the action would deter a 'reasonable employee' from exercising his rights." (quoting *Burlington*, 548 U.S. at 68)).

To state a Title VII retaliation claim, a plaintiff must plead facts tending to show that:  1) the plaintiff participated in a protected activity known to the defendant; 2) the defendant took an employment action disadvantaging the plaintiff; and 3) the existence of a causal connection between the protected activity and the adverse action.  *Patane v. Clark*, 508 F. 3d 106, 115 (2d Cir. 2007) (citing *Feingold v. New York*, 366 F. 3d 138, 156 (2d Cir. 2004)).   Moreover, the causal connection can be established by showing a temporal proximity between the protected activity and the adverse action.  *See Feingold*, 366 F. 3d at 156-57 (collecting cases).   Finally, at the motion to dismiss stage, Plaintiffs are not required to plead a prima facie case, but they must nevertheless "allege facts that state a plausible retaliation claim."  *Jackson v. N.Y. State Dep't of Labor*, 709 F. Supp. 2d 218, 228 (S.D.N.Y. 2010).   Here, it cannot be disputed that Plaintiffs have stated the first element their claim, as the instant lawsuit alleging employment discrimination is a protected activity known to Defendants.   Moreover, as discussed below, the Court finds that Plaintiffs, in part, have pled facts sufficient to establish the second and third elements of their retaliation claim against Defendants, as those facts existed *at the time the Amended Complaint was filed.*[13]   Accordingly, Defendants' motion to dismiss this claim only is

---

[13] There is uncontested evidence that the facts, as alleged at the time the Amended Complaint

denied.

     i.  <u>Hurried Closure and Inmate Transfers</u>

Plaintiffs first allege Defendants retaliated against them by forcing Plaintiffs "to endure a hurried attempt to close the facility with inappropriate transfer of inmates[.]" (Am. Compl. ¶ 75.) Specifically, Plaintiffs allege that between June 30, 2011, the date Governor Cuomo announced the December 1, 2011 closure of Arthur Kill, and July 18, 2011, the date Plaintiffs initiated this lawsuit, no inmates or COs were transferred from Arthur Kill. (*Id.* ¶ 74.) Plaintiffs further allege that, after they filed this lawsuit, Defendants transferred, "wholesale," certain "trained inmates" who worked in the Mess Hall, Law Library, and who served on liaison and grievance committees, without ensuring any such trained inmates remained at Arthur Kill until the facility closed. (*Id.* ¶ 57.) The transfer of these trained inmates purportedly left Arthur Kill in a state of "tremendous turmoil and unrest which concern[ed] the [corrections] Officers." (*Id.*)

As an initial matter, the assertion that Plaintiffs were "forced to endure a hurried attempt to close the facility" is vague and is lacking any factual allegation showing how the closure was hurried. As such, it is simply an unsupported conclusion that the Court need not accept as true. Further, the Court finds the fact that Defendants transferred certain "trained inmates" from Arthur Kill before the prison closure was complete is not a materially adverse employment action. Indeed, as Plaintiffs concede, Defendants announced the plan to close Arthur Kill and, by extension, transfer inmates, before the instant suit was filed. The fact that Defendants engaged in conduct planned before the initiation of this lawsuit is not an employment action "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57; *see also Clark County Sch.*

---

was filed, are no longer true. *See infra* Part II.D.ii.

*Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").  Accordingly, Plaintiffs retaliation claim premised on these actions is dismissed.

## ii.  Defendants' Failure to Hold Informational Meetings

Plaintiffs also contend that meetings to discuss the consequence of the prison closure were held at upstate facilities but that, in retaliation for bringing this suit, no meetings were scheduled with Arthur Kill staff and that the officers were subjected to involuntary transfers without the appropriate information.  (*Id.* ¶¶ 74, 75; *see also* Pls.' Mem. at 8 ("Defendants do [sic] not conduct the requisite meetings to inform plaintiffs about the consequences of closure and the various options allegedly available.  Instead, as a form of retaliation, defendants commenced transfers and reductions in force unilaterally and without proper information or notification.").)

The Court questions whether Plaintiffs' continued assertion that Defendants retaliated against Plaintiffs by failing to hold meetings at Arthur Kill to discuss the consequences of the prison closure and failed provide information about the transfer process has been made in good faith.  While the Court must, and does, accept as true all non-conclusory factual allegations contained in the Amended Complaint, this presumption of truth should not be taken as an unfettered license to plead facts from whole cloth.  The Court notes that, in direct contradiction to Plaintiffs' allegation, Daniel F. Martuscello III ("Martuscello"), the Director of Human Resources for DOCCS affirmed, in a sworn affidavit made in connection with Defendants' opposition to Plaintiffs' TRO request, that he anticipated the meetings at Arthur Kill would be

scheduled for September 2011. (*See* Aug. 4, 2011 Decl. of Daniel F. Martuscello III ("Martuscello Aug. 4, 2011 Decl.") ¶ 12, Doc. Entry No. 20.) Indeed, in a second sworn affidavit made in connection with Defendants' motion to dismiss, Martuscello confirms that he held meetings at Arthur Kill from September 19, 2011 thru September 21, 2011, "to discuss the impact of the closure on the staff . . . [and] provide[] staff with a packet of information relative to the reduction-in-force process[.]"  (Martuscello Mar. 14, 2012 Decl. ¶¶ 8-10.) Annexed to the Martuscello March 14, 2012 Declaration, as Exhibits A and B, are memoranda sent to each closing facility detailing the reassignment procedures. Also annexed as Exhibit C is a copy of the information packet provided to all Arthur Kill staff explaining the closure and transfer procedure. Plaintiffs' Amended Complaint was filed September 16, 2011, three days before the first meeting at Arthur Kill took place.[14] Significantly, Plaintiffs' memorandum of law is dated February 10, 2012, almost five months after the Arthur Kill meetings took place, yet Plaintiffs persist in asserting no meetings were held. (*See* Pls.' Mem. at 8.)

Notably, Plaintiffs have neither contested any of the representations made in the Martuscello March 14, 2012 Declaration and Exhibits nor have they objected to the Court's consideration of documents d'hors the complaint in deciding the instant motion to dismiss. Nonetheless, the Court is aware that, on a motion to dismiss pursuant to Rule 12(b)(6), "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F. 3d 499, 509 (2d Cir. 2007). However, in certain limited circumstances a court may consider documents outside the complaint, such as documents attached to the complaint as exhibits and documents incorporated by reference in the complaint, matters of

---

[14] In light of this timeline, it would appear highly unlikely that the informational meetings were scheduled only after the Amended Complaint was filed. Thus making it even more unlikely that this final federal claim is made in good faith.

which judicial notice may be taken, and documents that are either in a plaintiff's possession or of which a plaintiff had knowledge and relied on in filing the complaint. *Halebian*, 644 F. 3d at 131 n.7 (internal citations and quotation marks omitted).  The Court is further aware that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153 (2d Cir. 2002) (emphasis in original)).

   Martuscello's March 14, 2012 Declaration is not a document that fits into any of these categories.  Thus, ultimately, the Court must exclude it from consideration of the pending motion to dismiss, and is constrained to take Plaintiffs' assertion as true.  However, the Court reminds Plaintiffs' counsel of its authority, pursuant to Rule 11 of the Federal Rules of Civil Procedure, to impose sanctions where a party makes false, misleading, improper, or frivolous representations to the Court.  *See Williamson v. Recovery Ltd. P'ship*, 542 F. 3d 43, 51 (2d Cir. 2008) ("Rule 11(c) of the Federal Rules of Civil Procedure [ ] allows the court to sanction a party, if the court determines that the party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court.").

   Taken as true for the purposes of this motion, the Court finds Plaintiffs' allegation that, after Plaintiffs initially filed the instant suit, Defendants held meetings at upstate facilities to discuss the consequence of the prison closure and inform staff about transfer options, but that they did not conduct any meetings at Arthur Kill, are facts tending to show a materially adverse employment action.  Put differently, the Court finds that, as alleged by Plaintiffs, the failure to provide certain employees with information regarding both the consequences of a major change in the structure of a place of employment and information regarding how to best navigate that

34

change, are actions "'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks v. Baines*, 593 F. 3d 159, 165 (2d Cir. 2010) (quoting *Burlington*, 548 U.S. at 57).  As such, Plaintiffs have met the second element of their claim.  Moreover, because of the temporal proximity between the protected activity and the alleged adverse action, the Court finds Plaintiffs have pled facts sufficient to show a causal connection between them.  *See Feingold*, 366 F. 3d at 156.

Accordingly, for purposes of this motion to dismiss, and with the reservations set forth above, the Court finds Plaintiffs have met all three elements to state a retaliation claim premised on the allegation that Defendants failed to provide information to Plaintiffs about the impact of the prison closures and inform them about transfer options.  As such, Defendants' motion is denied as to this claim only.

### E.  New York Human Rights Law

As to their fifth claim, Plaintiffs allege Defendants discriminated against them in violation of N.Y. Executive Law § 296, the New York Human Rights Law ("NYSHRL"). Defendants argue the Eleventh Amendment bars adjudication of Plaintiffs NYSHRL claim against the State and Governor Cuomo in his official capacity, and that, under New York law, the claim is also barred against Governor Cuomo in his individual capacity.  (Defs.' Mem. at 18.) Plaintiffs appear to concede Defendants' arguments, as they fail to acknowledge or contest them. Instead, Plaintiffs simply urge the Court not to dismiss this claim "in the interest of judicial economy."  (Pls.' Mem. at 8.)  The Court agrees with Defendants.  Accordingly, the NYSHRL claim against the State and Governor Cuomo in his official and individual capacities is dismissed.

It is well established "that the Eleventh Amendment bars the adjudication of pendent

state law claims against nonconsenting state defendants in federal court." *Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 540-41 (2002) (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 120 (1984)).   It is also well settled that the ambit of the Eleventh Amendment's immunity includes a governor, in his official capacity, "so long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Brown v. Paterson*, 2012 WL 639151, at *5 (S.D.N.Y. Feb. 28, 2012) (quoting *Al-Jundi v. Estate of Rockefeller*, 885 F. 2d 1060, 1067 (2d Cir. 1989)).   Plaintiffs have pled no facts showing that the Eleventh Amendment should not apply to Governor Cuomo in his official capacity.

In assessing whether NYSHRL claims against nonconsenting state defendants can be adjudicated in federal courts, district courts in this Circuit have "consistently found that the NYSHRL does not include a waiver of the State's sovereign immunity to suit in federal court." *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 451 (E.D.N.Y. 2002) (collecting cases). Accordingly, since sovereign immunity has not been waived and "[s]upplemental jurisdiction under 28 U.S.C. § 1367(a) does not constitute a congressional abrogation of the Eleventh Amendment granting district courts the power to adjudicate pendent state law claims," *Id.* (citing *Raygor*, 534 U.S. at 542), Plaintiffs' NYSHRL claim against the State and Governor Cuomo in his official capacity is dismissed.

Defendants also argue the claim should be dismissed against Governor Cuomo in his individual capacity.   Defendants acknowledge that a NYSHRL claim can be brought against a person in his/her individual capacity. *See, e.g., Lore v. City of Syracuse*, 670 F. 3d 127, 169 (2d Cir. 2012) (citations omitted) (recognizing that under the NYSHRL liability for employment discrimination may be imposed on individuals).   Specifically, the NYSHRL permits suits against

36

individual aiders and abettors of employment discrimination.  *See* N.Y. Executive Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.").  An individual cannot be found liable under the NYSHRL for "aid[ing] and abet[ting] his own alleged discriminatory conduct."  *Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (citing *Strauss v. New York State Dep't Of Educ.*, 26 A.D.3d 67, 73 (3d Dep't 2005)).  Governor Cuomo, as an individual, cannot be held liable for aiding and abetting his own alleged violation of the NYSHRL; therefore the claim against him in his individual capacity is dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Plaintiffs' first, second, third, fifth and sixth claims are granted in their entirety.  Defendants' motion to dismiss Plaintiffs' retaliation claim is granted in part, but denied only as to Plaintiffs' claim that Defendants held informational meetings to discuss the consequence of the prison closure at upstate facilities, but held no similar meetings with Arthur Kill staff, resulting in Plaintiffs being subjected to involuntary transfers without being provided the appropriate information in advance. However, keeping the mandates of Federal Rule of Civil Procedure 11 in mind, Plaintiffs are strongly urged to reassess this remaining claim and either file a letter withdrawing it, if there is no good faith basis for continuing to assert it, or file a sworn declaration setting forth sworn allegations of fact in support of this claim, NO LATER THAN August 13, 2012.

SO ORDERED.

Dated: Brooklyn, New York
       August 7, 2012

_____
        /s/
      DORA L. IRIZARRY
      United States District Judge